## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAMANY BROWNE, individually and on behalf of all similarly situated persons,<br><br>       Plaintiff,<br><br>  v.<br><br>HELLO PRODUCTS LLC, a Delaware limited liability company,<br><br>       Defendant. | Case No.<br><br>**CLASS ACTION**<br><br>JURY TRIAL DEMANDED |

Plaintiff Damany Browne ("Plaintiff"), on behalf of himself and all others similarly situated ("Class" or "Class Members"), brings this class action complaint against Defendant Hello Products LLC ("Defendant" or "Hello Products"). The allegations asserted herein are based on Plaintiff's personal knowledge of facts pertaining to himself and upon information and belief, including further investigation conducted by Plaintiff's counsel, as to the remainder.

### NATURE OF THE ACTION

1. Plaintiff commences this class action to stop Defendant's deceptive, unfair, and unsafe business practice of manufacturing, distributing, advertising, marketing, and selling its toothpaste products which contain or risk containing dangerously high levels of heavy metals like lead and mercury. The products at issue are all of Defendant's Hello-branded toothpastes, including without limitation Hello Kids Dragon Dazzle Toothpaste and Hello Kids Fluoride Free Toothpaste Fresh Watermelon (the "Products").

2. Defendant is a manufacturer and seller of toothpaste. Plaintiff is one of many consumers who purchased toothpaste for regular and ordinary use.

1

3.    Prior to placing the Products into the stream of commerce and the hands of consumers to use on themselves and their children, Defendant knew or should have known that the Products contained or risked containing significant and unsafe levels of lead and/or mercury. Yet Defendant omitted this information on packaging and otherwise failed to warn about the significant presence or risk of presence of heavy metals.

4.    Plaintiff and Class Members reasonably relied on Defendant's representations and omissions which led them to believe the Products were safe, healthy, unadulterated, and without significant levels of heavy metals.

5.    Plaintiff and Class Members purchased and/or used the Products and were therefore exposed to, or risked being exposed to, the harmful presence of heavy metals linked to adverse health conditions.

6.    The heavy metals are avoidable constituents in the Products and Defendant's manufacturing process.

7.    Defendant is therefore liable to Plaintiff and Class Members for selling, advertising, manufacturing, and distributing the Products with affirmative misrepresentations and without conspicuously disclosing that the Products contain or risk containing significant and unsafe levels of heavy metals.

## **PARTIES**

8.    Plaintiff Browne is, and at all times relevant to this action was, a resident of Brooklyn, New York in Kings County. Plaintiff therefore is a citizen and domiciliary of New York.

9.    On information and belief, Defendant is, and at all times relevant to this action was, a Delaware limited liability company with its principal place of business in Montclair, New Jersey.

Defendant sells, manufactures, and/or distributes the Products, including to consumers in New York.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more proposed Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and (iii) there is minimal diversity because at least one class member and Defendant are citizens of different states.

11.     Defendant has contacts in this forum sufficient to subject it to personal jurisdiction. Defendant continuously and systematically places goods into the stream of commerce for distribution in New York, offers to ship products to New York, markets the Products to persons in New York, and manufactures and supplies the Products to third-party sellers to sell to consumers in New York. Exercising jurisdiction over Defendant is fair, just, and reasonable considering the quality and nature of Defendant's acts that occur in New York, and which affect interests located in New York. Defendant has purposefully availed itself of the privilege of conducting activities in New York and should reasonably anticipate being hauled into court in New York.

12.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District, Defendant transacts substantial business in this District, and Defendant has intentionally availed itself of the laws and markets within this District.

## FACTUAL ALLEGATIONS

A.      **Defendant is a Prominent, Knowledgeable, and Experienced Manufacturer and Seller of Toothpaste.**

13.     Toothpaste is a hygiene product used daily. Its purpose is simple—to promote and maintain oral hygiene. For example, toothpaste aids in removing dental plaque and food from the teeth, assists in suppressing halitosis, and delivers active ingredients (most commonly fluoride) to help prevent tooth decay (dental caries) and gum disease (gingivitis).

14.     Defendant is among the leading toothpaste brands in the United States. On information and belief, sales of Hello-brand toothpaste in New York alone total tens of millions per year.

15.     Defendant prides itself as a major and influential player in the toothpaste market. According to Defendant's "About Us" webpage, Defendant states it makes "friendly products" and "we believe it's high time oral and personal care got a whole lot more friendly for you and your family. Hello, makes products that are relevant. beautiful. Welcoming. and good-for-you."[1]

16.     Defendant states its goal is "making the world a friendlier place, starting with your mouth [¶] hello is a new kind of friendly personal care, created by a small, entrepreneurial crew using thoughtful ingredients so delicious you'll rush to brush. for reals."[2]

17.     Defendant touts itself as experienced, knowledgeable, and a pioneer in the toothpaste market, including: "hello is a new kind of friendly personal care"; "delicious, natural flavors that taste awesome af."; "our products work great and are free from artificial sweeteners,

---

[1] Hello Products, *About Us*, https://www.hello-products.com/pages/about-us (last visited June 17, 2025).

[2] *Id.*

dyes, flavors, and parabens."; "we love people, the planet, and design. That's why hello is pretty.";
"our products mirror our values, aiming for a happier world with more smiles."; and "not tested
on animals."[3]

**B.    Study Recently Uncovers Dangerous Levels of Lead and Mercury in the
Products.**

18.    Lead Safe Mama LLC ("Lead Safe Mama") is a consumer safety organization and
advocate that conducts "independent, community-funded, scientific testing of consumer goods."[4]

19.    Lead Safe Mama recently tested various toothpastes widely available in the
marketplace, including certain Hello-brand toothpaste. The findings were published in early 2025
and continue to be updated as of June 14, 2025.[5]

20.    Lead Safe Mama specifically tested two of the Products—Hello Kids' Fluoride Free
Toothpaste Fresh Watermelon and Hello Kids' Dragon Dazzle Fluoride Toothpaste—which
showed the Products contained significant, dangerous, and alarmingly high levels of lead and
mercury.

   a.    The Hello Kids' Fluoride Free Toothpaste Fresh Watermelon tested for 493 ppb
(parts per billion) of lead and 19 ppb of mercury.[6]

---

[3] *Id.*

[4] Tamara Rubin, *Chart Comparing the Toxicant Profiles of Popular Toothpaste and Tooth
Powder Products Tested by an Independent, Third-Party Lab in 2025*, Lead Safe Mama (June 14,
2025),  https://tamararubin.com/2025/01/toothpaste-chart  (hereinafter,  "**Lead  Safe  Mama
Chart**").

[5] *Id.*

[6] *Id.*

b. The Hello Kids' Dragon Dazzle Fluoride Toothpaste tested for 428.4 ppb of lead and 11.8 ppb of mercury.[7]

**C.    Exposure to Heavy Metals from the Products is Dangerous.**

21.    Heavy metals bioaccumulate in the body. This means the body cannot excrete and expel toxins as quickly as they are absorbed, so the amount present in the body—along with the associated negative health risks—grows over time.[8]

22.    The U.S. Food and Drug Administration ("FDA") and World Health Organization ("WHO") have declared heavy metals "dangerous to human health."[9]

23.    For example, exposure to heavy metals puts children at risk for diminished mental capacity, behavioral problems (like attention deficit hyperactivity disorder), type 2 diabetes, and cancer, among other health issues.

24.    Heavy metals also pose health risks to adults. Even modest amounts of ingested heavy metals can increase the risk of cancer, cognitive and reproductive problems, and other adverse conditions.  These facts underscore the importance of limiting heavy metal exposure and consumption.

25.    It is particularly important to limit or eliminate heavy metals from household products, like toothpaste, which are used daily and absorbed or ingested into the blood stream.

---

[7] *Id.*

[8] Jesse Hirsch, *Heavy Metals in Baby Food: What You Need to Know*, Consumer Reports (June 27, 2023), https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/.

[9] *Staff Report: Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury*, Subcommittee on Economic and Consumer Policy Committee on Oversight and Reform U.S. House of Representatives (Feb. 4, 2021), https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (hereinafter, "**House Report**").

1.    **Lead.**

26.    The Products contain unsafe levels of lead, which in adults can suppress the immune system and cause hypertension,[10] plus "kidney damage, cardiovascular problems, reproductive damage, and brain damage, and in children can lead to brain and nervous system damage, learning disabilities, behavioral problems, and developmental delays."[11]

27.    Lead exposure can seriously harm the brain and nervous system and is associated with a range of negative health outcomes such as behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth. Lead exposure can also lead to cancer.

28.    Children are at especially high risk of developing adverse effects from lead exposure due to their developing brains, and because, compared to adults, less lead is stored by the body in bones and teeth and more in the nervous system.[12]

29.    No amount of lead is safe for human exposure or consumption. Indeed, according to the FDA, CDC, and WHO, there is no "safe" level of lead in blood.[13]

---

[10] *Lead Poisoning*, World Health Organization (Sep. 27, 2024), https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health.

[11] Karen Feldscher, *Synthetic Braiding Hair Used by Black Women Contain Dangerous Chemicals*, Harvard T.H. Chan School of Public Health (Mar. 5, 2025), https://hsph.harvard.edu/news/synthetic-braiding-hair-used-by-black-women-contain-dangerous-chemicals/.

[12] Fernando Barbosa, Jr. et al., *A Critical Review of Biomarkers Used for Monitoring Human Exposure to Lead: Advantages, Limitations, and Future Needs*, PubMed Central (Aug. 11, 2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1314903.

[13] Jessica Pupovac, *Lead Levels Below EPA Limits Can Still Impact Your Health*, NPR (Aug. 13, 2016), https://www.npr.org/sections/thetwo-way/2016/08/13/489825051/lead-levels-below-epa-limits-can-still-impact-your-health ("No amount of lead is known to be safe."); *Lead in Food and Foodwares*, FDA, https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares (last updated Jan. 6, 2025); *About Childhood Lead Poisoning Prevention*,

30.     According to the CDC, "[t]esting products in a laboratory is the only way to tell for certain if the product contains lead. It is best to avoid the use of products that may contain lead."[14]

31.     As noted above, bodily exposure to lead builds up over time. Buildup has been clinically shown to lead to the development of chronic poisoning, cancer, developmental, and reproductive disorders, in addition to serious injuries to the nervous system, organs, and body systems.

32.     "Because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time."[15]

33.     Of note, "[r]epeated low-level exposure [to lead] over a prolonged period" can result in "chronic poisoning" and adverse symptoms including "persistent vomiting, encephalopathy, lethargy, delirium, and coma."[16] This has occurred when blood lead levels reach 40 to 60 µg/dl.[17] Moreover, "Elevated levels of lead exposure have been consistently associated with a range of kidney abnormalities, even when lead concentrations are relatively modest, such

Centers for Disease Control and Prevention (Mar. 13, 2025), https://www.cdc.gov/lead-prevention/about/index.html?CDC_AAref_Val=https://www.cdc.gov/nceh/lead/prevention/health effects.html ("There are no safe levels of lead in the blood.").

[14] *About Lead in Foods, Cosmetics, and Medicines*, Centers for Disease Control and Prevention (Sep. 24, 2024), https://www.cdc.gov/lead-prevention/prevention/foods-cosmetics-medicines.html.

[15] House Report at 49.

[16] Bhasin T. et al., *Unveiling the Health Ramifications of Lead Poisoning: A Narrative Review*, Cureus Journal of Medical Science (Oct. 9, 2023), https://www.cureus.com/articles/184381-unveiling-the-health-ramifications-of-lead-poisoning-a-narrative-review#!/.

[17] *Id.*

8

as around 10 µg/dl."[18] And, for context, 1 µg/dl equates to .01 ppm (parts per million) or 10 ppb (parts per billion).[19]

34.    In short, lead is extremely toxic even at low levels, and especially so over an extended time.

### 2.    Mercury.

35.    "Mercury is a naturally occurring chemical element found in rock in the earth's crust, including in deposits of coal."[20] "In its inorganic form, mercury occurs abundantly in the environment, primarily as the minerals cinnabar and metacinnabar, and as impurities in other minerals."[21]

36.    "Mercury exposure at high levels can harm the brain, heart, kidneys, lungs, and immune system of people of all ages. High levels of methylmercury in the bloodstream of babies developing in the womb and young children may harm their developing nervous systems, affecting their ability to think and learn."[22]

37.    "High exposure to inorganic mercury may result in damage to the gastrointestinal tract, the nervous system, and the kidneys."[23] "Both inorganic and organic mercury are absorbed through the gastrointestinal tract and affect other systems through this route."[24] "Symptoms of

---

[18] *Id.*

[19]                                                        *See*                                                        Endmemo,
https://www.endmemo.com/concentration_solution/microgram_deciliterpartpermillion.html.

[20]  *Basic Information about Mercury*, U.S. Environmental Protection Agency,
https://www.epa.gov/mercury/basic-information-about-mercury (last updated Dec. 5, 2024).

[21] *Id.*

[22] *Id.*

[23]  *Health Effects of Exposures to Mercury*, U.S. Environmental Protection Agency,
https://www.epa.gov/mercury/health-effects-exposures-mercury (last updated Dec. 5, 2024).

[24] *Id.*

high exposures to inorganic mercury include: skin rashes and dermatitis; mood swings; memory loss; mental disturbances; and/or muscle weakness."[25]

38.    Importantly, "exposure to mercury – even in small amounts – may cause serious health problems, and is a threat to the development of the child in utero and early in life."[26] For example, "Mild, subclinical signs of central nervous system toxicity can be seen in workers exposed to an elemental mercury level in the air of 20 µg/m3 or more for several years. Kidney effects have been reported, ranging from increased protein in the urine to kidney failure."[27]

39.    Stated differently, mercury "even at low concentrations . . . can have harmful long-term health effects, causing headaches, limb pain, tooth loss, or general weakness."[28]

**D.    The Levels of Heavy Metals in the Products are Significant and Dangerous.**

40.    According to the U.S. Environmental Protection Agency ("EPA"), Maximum Contaminant Level Goals ("MCLGs") are "non-enforceable health goals" based on "possible health risks."[29] The EPA also sets "an enforceable regulation called a maximum contaminant level (MCL) based on the MCLG. MCLs are set as close to the MCLGs as possible, considering cost,

---

[25] *Id.*

[26] *Mercury*, World Health Organization (Oct. 24, 2024), https://www.who.int/news-room/fact-sheets/detail/mercury-and-health.

[27] *Id.*

[28] Angelika Edyta Charkiewicz et al., *Mercury Exposure and Health Effects: What Do We Really Know?*, Int'l Journal of Molecular Science (Mar. 5, 2025), https://www.mdpi.com/1422-0067/26/5/2326.

[29] Basic Information about Lead in Drinking Water, U.S. Environmental Protection Agency, https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water (last updated May 22, 2025).

benefits and the ability of public water systems to detect and remove contaminants using suitable treatment technologies."[30]

41.    For drinking water, the EPA set the MCLG for lead at zero, and the action level[31] at 0.015 mg/L (equivalent to 0.015 ppm or 15 ppb).[32] The "EPA has set this level based on the best available science which shows there is no safe level of exposure to lead. The fact that there is no safe level of exposure underscores the fact that any action to reduce exposures can have impacts on lives and livelihoods."[33]

42.    For inorganic mercury in drinking water, the EPA set both the MCLG and MCL to 0.002 mg/L (equivalent to 0.002 ppm or 2 ppb).[34] But there is no safe level. "Mercury is a highly toxic element; there is no known safe level of exposure. Ideally, neither children nor adults should have *any* mercury in their bodies because it provides no physiological benefit."[35]

43.    The levels of lead and mercury in the Products far exceed these thresholds many times over. Specifically:

---

[30] *Id.*

[31] In lieu of a formal MCL for lead, the EPA established a "Treatment Technique" action level.  *See*  https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water.

[32] *National Primary Drinking Water Regulations*, U.S. Environmental Protection Agency, https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations (last updated Dec. 12, 2024).

[33] Basic Information about Lead in Drinking Water, U.S. Environmental Protection Agency, https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water (last updated May 22, 2025).

[34] *National Primary Drinking Water Regulations*, U.S. Environmental Protection Agency, https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations (last updated Dec. 12, 2024).

[35] https://pmc.ncbi.nlm.nih.gov/articles/PMC3096006/#:~:text=Acute%20or%20chronic%20mercury%20exposure,it%20provides%20no%20physiological%20benefit.

a. The 493 ppb of lead in Hello Kids' Fluoride Free Toothpaste is 32 times the EPA's action level, and the 19 ppb of mercury is 9 times the EPA's MCL level.

b. The 428.4 ppb of lead in Hello Kids' Dragon Dazzle Fluoride Toothpaste is 28 times the EPA's action level, and the 11.8 ppb of mercury is over 5 times the EPA's MCL level.

44. This especially concerning because toothpaste is swallowed and absorbed sublingually when used by adults, and even more so by young children.

**E.    Toothpaste Can Be Manufactured Without Detectible Lead and Mercury.**

45. Based on present day manufacturing capabilities, toothpaste can be manufactured without detectible levels of lead and mercury in finished products.

46. To that end, according to Lead Safe Mama, competing toothpaste brands have manufactured toothpaste with non-detectable levels (less than 5 ppb and likely zero) of lead and mercury.[36] These include:

a. Orajel Kids Training Toothpaste in Natural Berry Fruity Flavor, Elmo Sesame Street Packaging, Fluoride-free

b. Miessence Mint Toothpaste, Fluoride Free

c. Dr. Brown's Fluoride-free Baby Toothpaste in Strawberry Flavor

d. Pegciz Kids Foam Toothpaste (Low Fluoride) in Watermelon Flavor

e. Kid's Spry Tooth Gel with Xylitol in Original Flavor

47. Accordingly, the reasonable consumer's expectations described herein are in fact reasonable and do not set an impossible standard.

---

[36] Lead Safe Mama Chart.

**F.     Reasonable Consumers are Deceived by Defendant's Misrepresentations and Failure to Disclose that the Products Contain or Risk Containing Significant and Unsafe Levels of Heavy Metals.**

48.     Defendant's Products should not have contained significant levels of heavy metals, let alone dangerous levels. And Defendant failed to disclose on the Products' labeling (or anywhere in Defendant's point-of-sale marketing) that the Products contain or risk containing significant or unsafe levels of heavy metals.

49.     As explained above, Defendant positions itself and its brand as trustworthy, safe, and responsible to consumers. Defendant's advertising and labeling is designed to reinforce this message. To that end, exemplars of the Products' packaging and advertising (collected from publicly available sources) are shown below.

<u>**Hello Kids' Fluoride Free Toothpaste Fresh Watermelon**</u>









*Images dated June 17, 2025 (Target.com and Amazon.com)*

**Hello Kids' Dragon Dazzle Fluoride Toothpaste**







*Images dated June 17, 2025 (Target.com and Amazon.com)*

50.    The above representations on labeling and in advertising, taken individually and collectively, lead reasonable consumers to believe that the Products (1) are safe to use regularly

15

for children and adults, (2) are beneficial to health and hygiene, and (3) do not contain or risk containing significant or unsafe levels of dangerous heavy metals like lead and mercury.

51.    Indeed, statements like "tastes awesome," "works brilliantly," "removes plaque," "thoughtfully formulated with . . . high quality ingredients," "#brushhappy," "polishes + brightens," "safe for all ages," "no artificial sweeteners," "no dyes," "no artificial flavors," "no parabens," "no SLS/sulfates," "no triclosan," "no gluten," "no brainer," "kids all ages," "kids ages 2+," "prevents cavities," "strengthens enamel," "tastes magical," and "no preservatives" (and similar label statements with minor variations), taken individually and collectively, all lead reasonable consumers to believe that the Products are safe for regular use, and do not contain or risk containing significant levels of toxins like heavy metals.

52.    Any reasonable consumer would consider the presence or potential presence of dangerous substances like heavy metals important information. Indeed, had the mere presence or potential presence of heavy metals been disclosed by Defendant reasonable consumers would not purchase the Products.

53.    Further, had the presence or potential presence of dangerous substances at significant and unsafe levels been disclosed by Defendant, reasonable consumers would not purchase the Products.

54.    When faced with two toothpaste options in a store—one which does not contain or risk containing significant levels of heavy metals, and another which contains or risks containing significant levels of heavy metals—reasonable consumers would avoid the latter. This is because consumers value healthy and safe products that do not contain or risk containing significant levels of toxicants. Additionally, the risk of physical harm brings into question the Products' core

functionality, which is to help consumers maintain health and hygiene. Absent adequate pre-sale disclosures on packaging, reasonable consumers are deprived of making an informed choice.

55.    The above deception is particularly material in the context of toothpaste. These Products are used daily and come in direct contact with a person's mouth. With each use, the Products are ingested or quickly absorbed into bodily systems, particularly when swallowed or placed under the tongue.

### G.    Defendant's Duty to Disclose.

56.    Defendant was obligated to disclose that the Products contained or risk containing significant or unsafe levels of heavy metals.

57.    Defendant could have and should have prominently disclosed the limitations and omitted facts on packaging or at the point of sale—all prior to purchase. Had Defendant disclosed that the Products contain or risk containing significant or unsafe levels of heavy metals, consumers would have been aware of it.

58.    <u>Superior Knowledge</u>: Defendant is experienced in the design and manufacture of toothpaste like the Products at issue. On information and belief, as a manufacturer and company whose goal is to improve oral hygiene, Defendant is aware of the raw inputs used to manufacture the Products and, thus, was aware that the Products were manufactured with significant levels of heavy metals present in the finished Products. Further, on information and belief, Defendant conducts tests, including pre-sale testing, to verify the contents and specifications of the Products sold. Indeed, Defendant repeatedly touts that its products are free of "bad" and harmful ingredients, and instead use "high quality" ingredients, as a way to differentiate itself in the marketplace.

59.    <u>Active Concealment</u>: Defendant actively concealed the Products' shortcomings described above. On information and belief, in response to third-party inquiries regarding the

safety of its products, Defendant maintained that its products were safe and denied that the Products contained or risked containing unsafe levels of heavy metals. Further, contrary to the presence or potential presence of heavy metals, Defendant aggressively advertises the Products as safe for children and adults in marketing materials. Additionally, Defendant continues to advertise the products as safe and free of harmful ingredients to this day. These are acts of active concealment.

60.    <u>Contrary/Partial Representations</u>: As explained above, Defendant describes the Products on packaging and advertising as "tastes awesome," "works brilliantly," "removes plaque," "thoughtfully formulated with . . . high quality ingredients," "#brushhappy," "polishes + brightens," "safe for all ages," "no artificial sweeteners," "no dyes," "no artificial flavors," "no parabens," "no SLS/sulfates," "no triclosan," "no gluten," "no brainer," "kids all ages," "kids ages 2+," "prevents cavities," "strengthens enamel," "tastes magical," and "no preservatives," and similar statements with minor variations. Some of the Products are also advertised as safe and intended for children as young as two years old. Yet Defendant fails to disclose the risk or presence of unsafe levels of heavy metals. By disclosing some beneficial attributes about the Products' safety and expected performance, Defendant is obligated to disclose material limitations that negatively affect the use of the Products.

61.    Defendant knows that reasonable consumers would find the presence or material risk of heavy metals and other toxins material.

62.    Defendant knows that reasonable consumers would not knowingly give their children toothpaste products that contained significant levels of heavy metals.

63.    The dangerous propensity affects the central functionality of the Products in that it renders them unusable as intended and advertised. For the same reasons, the Products present an

unreasonable safety hazard because the products are dangerous to health when used regularly, and particularly when swallowed by children.

**H.    Plaintiff's Experience.**

64.    Plaintiff purchased Hello-branded toothpaste regularly, roughly every two months. In the last three years, Plaintiff repeatedly purchased Hello Kids' Dragon Dazzle Fluoride Toothpaste and Hello Kids' Fluoride Free Toothpaste Fresh Watermelon, including from Target stores in Brooklyn and Long Island and occasionally from surrounding Walmart stores.

65.    Representative examples of the Products' packaging are shown at paragraph 49, above.

66.    Before purchasing the Products, Plaintiff viewed the exterior labeling and packaging. Based on and consistent with the packaging shown above, he viewed statements describing the Products' beneficial attributes: "tastes awesome," "works brilliantly," "removes plaque," "thoughtfully formulated with . . . high quality ingredients," "#brushhappy," "polishes + brightens," "safe for all ages," "no artificial sweeteners," "no dyes," "no artificial flavors," "no parabens," "no SLS/sulfates," "no triclosan," "no gluten," "no brainer," "kids all ages," "kids ages 2+," "prevents cavities," "strengthens enamel," "tastes magical," and "no preservatives"—or similar statements with minor variations.

67.    Plaintiff understood these statements by Defendant as representing that the Products (1) were safe for regular use as a toothpaste by young children, (2) were beneficial to health and hygiene, (3) were free from significant levels of toxins and contaminants like heavy metals, and (4) did not contain or risk containing heavy metals in any amount, let alone in excess of thresholds deemed significant and/or unsafe.

68.    Plaintiff relied on these representations in deciding to purchase the Products.

69.     Plaintiff would not have purchased the Products, or at minimum would have paid less for them, had he known that the Products contained (or risked containing) any amount of heavy metals like lead and mercury.

70.     Plaintiff would not have purchased the Products, or at minimum would have paid less for them, had he known that the Products contained (or risked containing) significant or unsafe levels of heavy metals like lead and mercury.

71.     Plaintiff would not have purchased the Products, or at minimum would have paid less for them, had he known that the Products contained (or risked containing) heavy metals in excess of thresholds deemed safe by healthcare industry advocates.

72.     The Products were not, in fact, truthfully advertised and safe for intended use. Each Product Plaintiff purchased was worthless (or worthless than the purchase price) because it either contained or risked containing significant and dangerous levels of heavy metals.

73.     Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's deceptive and unfair conduct.

74.     Plaintiff continues to be interested in purchasing toothpaste that does not contain or risk containing significant or unsafe levels of heavy metals but will be unable to trust and rely on Defendant's packaging and so will not purchase Defendant's Products. Plaintiff would be willing to purchase the Products again with the assurance that Defendant does not omit the presence of significant levels of heavy metals on labeling, and that the Products do not contain or risk containing unsafe levels of heavy metals.

## CLASS ACTION ALLEGATIONS

75.    Plaintiff brings this action on behalf of himself, and all persons similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure and proposes the following Class definitions:

**New York Class:**
All persons in New York who purchased one or more Products during the Class Period.

76.    Excluded from the Class are the Defendant, the officers and directors of the Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendant has or had a controlling interest. Also excluded from the Class are persons who purchased the Products for purposes of resale.

77.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, discovery, concealment, and accrual issues, and ending on the date of entry of judgment.[37]

78.    Plaintiff reserves the right to expand, limit, modify, or amend the class definition stated above, including the addition of one or more subclasses, in connection with a motion for class certification, or at any other time, based upon, among other things, changing circumstances, or new facts obtained during discovery.

79.    **Numerosity (Rule 23(a)(1)).** The Class is so numerous that joinder of all members in one action is impracticable. The exact number and identities of the members of the Class is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, but on information and belief, Plaintiff alleges that there are in excess of 1,000 members of the Class.

---

[37] The Class Period begins at minimum 3 years from the date of filing of this action, but based on tolling, may extend beyond that date.

80.    **Typicality (Rule 23(a)(3)).** Plaintiff's claims are typical of those of other members of the Class, all of whom have suffered similar harm due to Defendant's course of conduct as described herein.

81.    **Adequacy of Representation (Rule 23(a)(4)).** Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class. Plaintiff has retained attorneys who are experienced in the handling of complex litigation and class actions, and Plaintiff and counsel intend to diligently prosecute this action.

82.    **Commonality and Predominance (Rule 23(a)(2), 23(b)(3)).** Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary among members of the Class, and which may be determined without reference to the individual circumstances of any member of the Class, include, but are not limited to, the following:

   a.    Whether the Defendant manufactured, distributed, advertised, marketed, and/or sold the Products.

   b.    Whether the Products contain or risk containing significant levels of lead or mercury.

   c.    Whether the Products contain or risk containing unsafe levels of lead or mercury.

   d.    Whether Defendant knew or should have known the Products contained or risked containing significant or unsafe levels of lead or mercury.

   e.    Whether a reasonable consumer would consider the presence of the heavy metals described herein to be material.

   f.    Whether Defendant misrepresented the Products to be of a particular standard or quality.

g.  Whether Defendant intended not to sell, manufacture, or distribute the Products as advertised and labeled.

h.  Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive.

i.  Whether Defendant engaged in deceptive business practices in violation of the New York General Business Law § 349, et seq.

j.  Whether Defendant's conduct constitutes false advertisement in violation of New York General Business Law § 350, et seq.

k.  Whether Defendant was unjustly enriched as a result of the unlawful conduct alleged herein such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class.

l.  Whether Defendant intentionally or recklessly omitted and/or failed to disclose or warn that the Products contain or risk containing the significant and unsafe levels of heavy metals described herein.

m. Whether Defendant concealed that Products contain or risk containing the significant and unsafe levels of heavy metals described herein.

n.  Whether Plaintiff and the Class are entitled to damages, restitution, and disgorgement from Defendant.

o.  Whether injunctive relief is appropriate and necessary to enjoin Defendant from continuing to supply the Products as manufactured and advertised.

83.  **Superiority (Rule 23(b)(3)).** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Requiring each individual class member to file an

23

individual lawsuit would unreasonably consume the amounts that may be recovered. Even if every member of the Class could afford individual litigation, the adjudication of at least tens of thousands of identical claims would be unduly burdensome to the courts. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented herein, presents no management difficulties, conserves the resources of the parties and of the court system, and protects the rights of the members of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action. The prosecution of separate actions by individual members of the Class may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other members of the Class who are not parties to such adjudications, or that would substantially impair or impede the ability of such non-party Class members to protect their interests.

84.     **Substantial Similarity**. On information and belief, the Products at issue in the action are substantially similar in all material respects. Namely, the Products consist of the same or similar ingredients and source materials, contain or risk containing the same or similar levels of heavy metals, are manufactured using the same or similar raw inputs, and are produced using the same or similar manufacturing processes. Additionally, the Products' labeling and advertising all misrepresent the Products as safe for ordinary and regular use and fail to disclose that the Products contain (or risk containing) significant and unsafe levels of heavy metals. The Products are also all sold, manufactured, distributed or otherwise supplied by Defendant.

## **TOLLING AND DELAYED DISCOVERY**

85.     All applicable statutes of limitations have been tolled by the delayed discovery doctrine.  Plaintiff and Class Members could not have reasonably discovered Defendant's practice of introducing Products latent with disease- and cancer-causing substances at significant and unsafe levels into the marketplace, at any time prior to commencing this class action litigation.

86.     A reasonable consumer purchasing Defendant's Products would simply believe that the Products are free of significant and unsafe levels of heavy metals linked to cancers and diseases. Nothing in Defendant's marketing or advertising of the Products would lead a reasonable consumer to suspect the existence or potential existence of carcinogenic or highly toxic ingredients, let alone at significant and dangerous levels.

87.     No reasonable consumer could have independently discovered that Defendant's Products are latent with carcinogens and health-deteriorating toxins, including at dangerous levels. Like Plaintiff, the reasonable consumer does not have access to sophisticated scientific resources, nor is the reasonable consumer trained to test the Products for toxins and evaluate their comparative safety. Relying on Defendant's representations of the quality and characteristics of the Products as safe for ordinary use, Plaintiff nor any reasonable consumer knew such scientific testing was needed.

88.     Plaintiff did not learn of the presence or potential presence of heavy metals as alleged herein until shortly before commencing this action.

89.     As a result, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

**COUNT I**
**VIOLATION OF NEW YORK DECEPTIVE TRADE PRACTICE ACT**
**(N.Y. Gen. Bus. Law § 349, et seq.)**
**(On Behalf of the Class)**

90.     Plaintiff hereby repeats and realleges paragraphs 1 through 89 of this Complaint and incorporates them by reference herein.

91.     New York General Business Law section 349 makes clear that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349(a).

92.     Reasonable consumers are likely to be misled by Defendant's conduct of engaging in deceptive acts or practices in the conduct of business or commerce in violation of N.Y. Gen. Bus. Law § 349.

93.     As detailed above, the representations on labeling and in advertising, taken individually and collectively, lead reasonable consumers to believe that Products (1) were safe for regular use as a toothpaste by young children, (2) were beneficial to health and hygiene, (3) were free from significant levels of toxins and contaminants like heavy metals, and (4) did not contain or risk containing heavy metals in any amount, let alone in excess of thresholds deemed significant and/or unsafe.

94.     In truth, the Products contain or risk containing significant levels of heavy metals. Additionally, the Products are unsafe because they contain or risk containing dangerous levels of heavy metals and therefore are of an inferior quality and trustworthiness and do not contain the qualities and characteristics as represented.

95.     Defendant directs its conduct at consumers, as its false, deceptive, or misleading statements are advertised on the Products' labeling and packaging. Indeed, no reasonable consumer

viewing the statements on the labeling and packaging, taken individually and collectively—"tastes awesome," "works brilliantly," "removes plaque," "thoughtfully formulated with . . . high quality ingredients," "#brushhappy," "polishes + brightens," "safe for all ages," "no artificial sweeteners," "no dyes," "no artificial flavors," "no parabens," "no SLS/sulfates," "no triclosan," "no gluten," "no brainer," "kids all ages," "kids ages 2+," "prevents cavities," "strengthens enamel," "tastes magical," and "no preservatives"—would believe the Products contain significant amounts of heavy metals like lead and mercury.

96.    A significant portion of the general consuming public or of targeted consumers, acting reasonably under the circumstances, would be misled by Defendant's representations and omissions of the Products' qualities and characteristics.

97.    Reasonable consumers do not expect a toothpaste company would encourage exposure to high levels of heavy metals like lead and mercury multiple times a day. Heavy metals provide no benefits and should be avoided.

98.    Reasonable consumers consider the presence of heavy metals a material fact when choosing oral hygiene products.

99.    Defendant also omitted and failed to disclose material information. Specifically, Defendant failed to disclose that the Products contain or risk containing significant levels of heavy metals. As explained above, this is a material attribute, a safety hazard, and concerns the Products' central functionality. Defendant could have and should have prominently disclosed the omitted information on labeling and point-of-sale advertising. Had Defendant disclosed the omitted information, Plaintiff and reasonable consumers would have been aware of it.

100.    As such, Defendant's deceptive acts are likely to mislead consumers acting reasonably under the circumstances. Defendant is aware of the raw inputs used to manufacture the

Products and therefore is aware of the overall quality and characteristics of its products. Yet, Defendant represents to consumers that the Products have qualities or characteristics they do not and/or makes material omissions to induce consumer purchase.

101.    Absent Defendant's misrepresentations, Plaintiff and the Class would not have purchased the Products they purchased from Defendant, or, at minimum, they would not have paid as much for the Products as they ultimately did. Plaintiff and the Class's reliance was a substantial factor in causing them harm.

102.    Plaintiff and the Class would not have purchased the Products, or at minimum would have paid less for them, had they known that the Products contained (or risked containing) any amount of heavy metals like lead and mercury.

103.    Plaintiff and the Class would not have purchased the Products, or at minimum would have paid less for them, had they known that the Products contained (or risked containing) significant or unsafe levels of heavy metals like lead and mercury.

104.    Plaintiff and the Class would not knowingly give their children toothpaste that contained or risked containing significant levels of heavy metals like lead and mercury. Reasonable consumers want to know about the presence of toxins in a product that is used regularly and put into the body.

105.    Exposure to any source of heavy metals should be avoided and minimized, and disclosure of the presence of heavy metals in products intended to be used regularly is material.

106.    Had the omitted information been disclosed, Plaintiff and the Class would have been aware of it and reasonably would have behaved differently. Among other things, they would not have purchased the Products they purchased from Defendant, or, at minimum, would not have paid as much for the items as they did.

107.    Defendant knew that its representation on labeling and packaging were untrue and/or misleading, as described above.

108.    Through engaging in unfair or deceptive acts or business practices, Defendant has and continues to fraudulently obtain money from Plaintiff and the Class.

109.    As a result of Defendant's conduct, Plaintiff and the Class have sustained damages in an amount to be proven at trial.

110.    Pursuant to GBL sections 349(h) and 350-D, Plaintiff and the Class seek money damages, restitution, and actual damages and/or $50 per violation (whichever is greater). Plaintiff and the Class also seek punitive damages, statutory damages, treble damages, injunctive relief, and attorneys' fees.

## COUNT II
**VIOLATION OF NEW YORK DECEPTIVE TRADE PRACTICE ACT**
**(N.Y. Gen. Bus. Law § 350, et seq.)**
**(On Behalf of the Class)**

111.    Plaintiff hereby repeats and realleges paragraphs 1 through 89 of this Complaint and incorporates them by reference herein.

112.    New York General Business Law section 350 defines false advertising as "advertising, including labeling . . . if such advertising is misleading in a material respect." N.Y. Gen. Bus. Law § 350-a(1).

113.    As detailed above, the representations on labeling and in advertising, taken individually and collectively, lead reasonable consumers to believe that Products (1) were safe for regular use as a toothpaste by young children, (2) were beneficial to health and hygiene, (3) were free from significant levels of toxins and contaminants like heavy metals, and (4) did not contain or risk containing heavy metals in any amount, let alone in excess of thresholds deemed significant and/or unsafe.

114.    In truth, the Products contain or risk containing significant levels of heavy metals.

115.    Additionally, the Products are unsafe because they contain or risk containing dangerous levels of heavy metals and therefore are of an inferior quality and trustworthiness and do not contain the qualities and characteristics as represented.

116.    Defendant directs its conduct at consumers, as its false, deceptive, or misleading statements are advertised on the Products' labeling and packaging. Indeed, no reasonable consumer viewing the statements on the labeling and packaging, taken individually and collectively—"tastes awesome," "works brilliantly," "removes plaque," "thoughtfully formulated with . . . high quality ingredients," "#brushhappy," "polishes + brightens," "safe for all ages," "no artificial sweeteners," "no dyes," "no artificial flavors," "no parabens," "no SLS/sulfates," "no triclosan," "no gluten," "no brainer," "kids all ages," "kids ages 2+," "prevents cavities," "strengthens enamel," "tastes magical," and "no preservatives"—would believe the Products contain significant amounts of heavy metals like lead and mercury.

117.    A significant portion of the general consuming public or of targeted consumers, acting reasonably under the circumstances, would be misled by Defendant's representations and omissions of the Products' qualities and characteristics.

118.    Reasonable consumers do not expect a toothpaste company would encourage exposure to high levels of heavy metals like lead and mercury multiple times a day. Heavy metals provide no benefits and should be avoided.

119.    Reasonable consumers consider the presence of heavy metals a material fact when choosing oral hygiene products.

120.    Defendant also omitted and failed to disclose material information. Specifically, Defendant failed to disclose that the Products contain or risk containing significant levels of heavy

metals. As explained above, this is a material attribute, a safety hazard, and concerns the Products' central functionality. Defendant could have and should have prominently disclosed the omitted information on labeling and point-of-sale advertising. Had Defendant disclosed the omitted information, Plaintiff and reasonable consumers would have been aware of it.

121.   As such, Defendant's deceptive acts are likely to mislead consumers acting reasonably under the circumstances. Defendant is aware of the raw inputs used to manufacture the Products and therefore is aware of the overall quality and characteristics of its products. Yet, Defendant represents to consumers that the Products have qualities or characteristics they do not and/or makes material omissions to induce consumer purchase.

122.   Absent Defendant's misrepresentations, Plaintiff and the Class would not have purchased the Products they purchased from Defendant, or, at minimum, they would not have paid as much for the Products as they ultimately did. Plaintiff and the Class's reliance was a substantial factor in causing them harm.

123.   Plaintiff and the Class would not have purchased the Products, or at minimum would have paid less for them, had they known that the Products contained (or risked containing) any amount of heavy metals like lead and mercury.

124.   Plaintiff and the Class would not have purchased the Products, or at minimum would have paid less for them, had they known that the Products contained (or risked containing) significant or unsafe levels of heavy metals like lead and mercury.

125.   Plaintiff and the Class would not knowingly give their children toothpaste that contained or risked containing significant levels of heavy metals like lead and mercury. Reasonable consumers want to know about the presence of toxins in a product that is used regularly and put into the body.

126.    Exposure to any source of heavy metals should be avoided and minimized, and disclosure of the presence of heavy metals in products intended to be used regularly is material.

127.    Had the omitted information been disclosed, Plaintiff and the Class would have been aware of it and reasonably would have behaved differently. Among other things, they would not have purchased the Products they purchased from Defendant, or, at minimum, would not have paid as much for the items as they did.

128.    Defendant knew that its representation on labeling and packaging were untrue and/or misleading, as described above.

129.    Through engaging in unfair or deceptive acts or business practices, Defendant has and continues to fraudulently obtain money from Plaintiff and the Class.

130.    As a result of Defendant's conduct, Plaintiff and the Class have sustained damages in an amount to be proven at trial.

131.    Pursuant to GBL section 350-D, Plaintiff and the Class seek money damages, restitution, and actual damages and/or $500 per violation (whichever is greater). Plaintiff and the Class also seek punitive damages, statutory damages, treble damages, injunctive relief, and attorneys' fees.

## COUNT III
### BREACH OF EXPRESS WARRANTY
### (N.Y. U.C.C. Law § 2-313)
### (On Behalf of the Class)

132.    Plaintiff hereby repeats and realleges paragraphs 1 through 89 of this Complaint and incorporates them by reference herein.

133.    Defendant issued an express warranty on the Products' labeling that the Products do not contain or risk containing harmful ingredients in any quantity.

134. Defendant issued an express warranty on the Products' labeling that the Products do not contain or risk containing harmful ingredients in significant quantities.

135. Defendant issued an express warranty on the Products' labeling and advertising that the Products are safe for ordinary use, and in particular young children.

136. Additionally, many Products are explicitly described on labeling as intended for children of all ages and/or children 2 years or older, thus promising that the Products are safe for children and adults. This includes language like "works brilliantly," "removes plaque," "thoughtfully formulated with . . . high quality ingredients," the term "Kids" in the Products' name, directions on how to use the Products for "kids to adults," and "safe for all ages" and "Kids 2+."

137. Defendant breached this express warranty because, as explained above, the Products contain or risk containing significant levels of heavy metals.

138. Additionally, Defendant breached this express warranty because, as explained above, the heavy metals render the products unsafe for children and adults. Indeed, toothpaste is inadvertently swallowed and absorbed sublingually when used by adults under ordinary conditions, and even more so by young children.

139. Defendant's affirmations of fact made to Plaintiff and the Class became a part of the basis of the bargain, thereby creating warranties that the Products would conform to Defendant's affirmations of fact.

140. Plaintiff and the Class relied on the representations in purchasing the Products as described above.

141. Plaintiff, though counsel, served a notice of breach letter on Defendant. The letter was delivered July 1, 2025. As of this filing, Defendant has not offered a remedy or otherwise responded.

142. Plaintiff and the Class were injured as a direct and proximate result of Defendant's breach because Defendant's affirmations induced reliance. Absent Defendant's affirmations, Plaintiff and the Class would not have purchased the Products if they had known the true facts, or would have paid less for the Products, and the Products did not have the quality, effectiveness, or value as promised.

143. As a result, Plaintiff and the Class have been damaged in the full amount of the purchase price of the Products, or at minimum a portion of the purchase price of the Products.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully prays for the following relief:

a. Certification of this case as a class action on behalf of the proposed Class and any subclasses defined above, appointment of Plaintiff as Class representative, and appointment of counsel as Class counsel.

b. An award to Plaintiff and the proposed Class and subclasses of restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement of all profits Defendant obtained from Plaintiff and the proposed Class as a result of its unlawful, unfair and fraudulent business practices described herein.

c. An injunction ordering Defendant to remove and/or modify the challenged misrepresentations and omissions.

d. An award of all economic, monetary, actual, consequential, and compensatory damages caused by Defendant's conduct where available.

e. An award of nominal, punitive, and statutory damages where available.

f. Reasonable expenses and attorneys' fees where available.

g.  Pre- and post-judgment interest, to the extent allowable; and

h.  For such further relief that the Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury for all claims so triable.


Dated: July 10, 2025                          Respectfully submitted,


                                              *By: /s/ Victoria J. Maniatis*
                                              Victoria J. Maniatis (NY Bar No. 2578896)
                                              **MILBERG COLEMAN BRYSON PHILLIPS
                                              GROSSMAN PLLC**
                                              100 Garden City Plaza, Suite 500
                                              Garden City, New York 11530
                                              Tel: 212-594-5300
                                              Email: vmaniatis@milberg.com

                                              Alexander E. Wolf (*pro hac vice* forthcoming)
                                              **MILBERG COLEMAN BRYSON PHILLIPS
                                              GROSSMAN, PLLC**
                                              280 South Beverly Drive, Penthouse Suite
                                              Beverly Hills, California 90212
                                              Tel: 872-365-7060
                                              Email: awolf@milberg.com

                                              William J. Edelman (*pro hac vice* forthcoming)
                                              **MILBERG COLEMAN BRYSON PHILLIPS
                                              GROSSMAN, PLLC**
                                              227 W. Monroe Street, Ste 2100
                                              Chicago, IL 60606
                                              Tel: 866-252-0878
                                              Email: wedelman@milberg.com